ORIGINAL

FILED

2010 APR 13 P 4: 03

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1  Michael Ram (SBN 104805)
2  **RAM & OLSON**
   555 Montgomery Street, Suite 820
3  San Francisco, CA 94111
   Telephone: (415) 433-4949
   Facsimile: (415) 433-7311
4  Email: mram@ramolson.com

5  *Attorneys for Plaintiffs Scott Friedson, Guy Snowdy,*
   *and Sharon Defren and their respective classes*
6
   *(Additional counsel listed on signature page)*
7

8
9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

                                                    EDL
11             **SAN FRANCISCO DIVISION**

12  SCOTT FRIEDSON, GUY SNOWDY,        cv 10      1574
    AND SHARON DEFREN, on behalf of    Case No. _____
13  themselves and all others similarly situated in
    their respective classes,          **INDIRECT-PURCHASER**
14                                      **PLAINTIFFS' CLASSES-**
                                        **ACTION COMPLAINT**
15        Plaintiffs,
                                        **DEMAND FOR JURY TRIAL**
16        v.

17  SONY CORPORATION; SONY
    OPTIARC AMERICA, INC.; SONY
18  OPTIARC, INC.; SONY NEC OPTIARC,
    INC.; HITACHI, LTD; HITACHI-LG
19  DATA STORAGE, INC.; LG
    ELECTRONICS, INC.; SAMSUNG
20  ELECTRONICS CO., LTD.; TOSHIBA
    CORPORATION; TOSHIBA SAMSUNG
21  STORAGE TECHNOLOGY CORP.;

22        Defendants.

23

24

25  I.    NATURE OF THE CASE, JURISDICTION AND VENUE

26        1.    This is a class action under Arizona, Kansas, and Minnesota antitrust and common

27  law. The Defendants are the world's leading manufacturers of Optical Disk Drives. Plaintiffs

28  allege that Defendants engaged in an illegal combination and conspiracy in restraint of trade, the

1  purpose and effect of which was to fix, stabilize and raise the price of Optical Disc Drives and

2  products containing Optical Disk Drives sold in the United States, including Arizona, Kansas,

3  and Minnesota, during the period between October 1, 2005 through the Present (the "Class

4  period").

5          2.      Optical Disk Drive Products are used in many consumer appliances, including

6  video game consoles, computers, CD players, CD -ROMs, DVD players, and DVD recorders.

7  Generating billions in revenues, this is one of the largest growing markets in the electronics

8  industry.  In the United States and throughout the world, most home entertainment and data

9  storage are on optical disks, either in CD format, DVD format, or now in Blu-Ray Disc format.

10         3.      Plaintiffs bring this action on their own behalf and on behalf of all other persons

11  or entities located in Arizona, Kansas, and Minnesota, respectively, who indirectly purchased for

12  end use Optical Disk Drives and products incorporating an Optical Disk Drive ("Optical Disk

13  Drive Products" or "ODD Products") at prices that were artificially inflated as a result of the

14  unlawful conspiracy and acts of the Defendants.

15         4.      Personal jurisdiction is proper as to each and every Defendant in that each and

16  every Defendant engaged, directly and through its agents and conspirators, in commercial

17  activities within this state that were intended to and did cause injuries to Plaintiffs and their

18  respective Classes.  This Court has subject-matter jurisdiction because the case satisfies the

19  requirements of 28 U.S.C. § 1332, as amended by the Class action Fairness Act, and the Judicial

20  Panel of Multidistrict Litigation has transferred all actions related to the original ODD Products

21  filing to this Court.

22         5.      Venue is proper in this Judicial District given that Defendants reside, transact

23  business, and/or are found within this District, and a substantial part of the events giving rise to

24  the claims arose in this District.

25         6.      There is an ongoing investigation by the United States Department of Justice into

26  the ODD market for anticompetitive activities.  These Defendants have an extensive record of

27  participating in anticompetitive conduct.  These Defendants have sought to price fix an array of

28  products sold in Arizona, Kansas, and Minnesota and the United States, including Thin Film

---

1 Transistor Liquid Crystal Display ("TFT-LCD"), Dynamic Random Access Memory ("DRAM"),

2 and Cathode Ray Tube ("ODD").

3        7.     During the Class period, this conspiracy included communications and meetings

4 in which Defendants agreed to eliminate competition and fix the prices for ODD Products. As a

5 result, Plaintiffs and their respective Classes have been injured in their business and property by

6 paying more for ODD Products than they otherwise would have in a competitive market place.

7        8.     As used herein, "ODD Products" include both optical disk drives (e.g. CD drives,

8 DVD drives, Blu-ray drives) manufactured by any of the named Defendants or their affiliates,

9 subsidiaries or co-conspirators, as well as products that *contain* or *incorporate* optical disk drives

10 (e.g. DVD players, video-game consoles like the Sony PlayStation 3, personal computers with

11 DVD drives) manufactured by any of the named Defendants or their affiliates, subsidiaries or co-

12 conspirators. Many of the Defendants are not only the major manufactures and sellers of ODDs,

13 but they are also some of the largest manufactures and sellers of computers and consumer

14 electronics products that contain ODDs.

15        9.     Except where specifically stated otherwise, all allegations herein are on

16 information and belief.

17 **II.    PARTIES**

18     **A.     Plaintiffs**

19       10.    Plaintiffs Scott Friedson is an Arizona resident that during the Class period

20 purchased ODD Products indirectly and for end use from one or more of the Defendants or their

21 controlled subsidiaries. As a result of the conspiracy, Friedson has been economically injured.

22       11.    Plaintiffs Guy Snowdy is a Kansas resident that during the Class period purchased

23 ODD Products indirectly and for end use from one or more of the Defendants or their controlled

24 subsidiaries. As a result of the conspiracy, Snowdy has been economically injured.

25       12.    Plaintiffs Sharon Defren is a Minnesota resident that during the Class period

26 purchased ODD Products indirectly and for end use from one or more of the Defendants or their

27 controlled subsidiaries. As a result of the conspiracy, Defren has been economically injured.

28

**B.     The Defendants**

13.     Defendant Sony Corporation ("Sony") is a business entity organized under the laws of Japan, with its principle place of business located at 1-7-1, Konan, Minato-Ku, TKY 108-0075, Japan.  During the Class period, Sony manufactured, sold and/or distributed ODD Products throughout the United States.

14.     Defendant Sony Optiarc America, Inc., ("SOA") formerly known as Sony NEC Optiarc, Inc., is wholly owned subsidiary of Sony Optiarc, Inc.  Sony Optiarc America, Inc. is a Delaware corporation with its principal place of business located at 1730 N. First Street, San Jose, California 95112.  Sony Optiarc America, Inc. was originally established as a joint venture in April 2006 before Sony announced that it would take over NEC's 45% share on September 11, 2008.  During the Class period, Sony Optiarc America, Inc. manufactured, sold and/or distributed ODD Products throughout the United States.

15.     Defendant Sony Optiarc, Inc. ("SOI") is a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  During the Class period, Sony Optiarc, Inc. manufactured, sold and/or distributed ODD Products throughout the United States.

16.     Defendant Sony NEC Optiarc, Inc. ("SNOI") was a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Defendant Sony NEC Optiarc Inc. was created on April 3, 2006 as a joint venture between defendants Sony Corp. and NEC Corp. in which Sony Corp. had a 55% interest and NEC Corp. had a 45% interest.  Sony Corp. purchased NEC Corp.'s interest in Sony NEC Optiarc Inc. in 2008 and renamed it Sony Optiarc, Inc. During the Class period, Sony NEC Optiarc, Inc. manufactured, sold and/or distributed ODD Products throughout the United States.

17.     Defendants Sony Corporation, Sony Optiarc America, Inc., Sony NEC Optiarc Inc., and Sony Optiarc, Inc. are referred to individually and collectively herein as "Sony."

18.     Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan with its principal executive office at 6-6 Marunouchi 1-chrome, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi Ltd. controls an integrated global enterprise comprised of itself and other entities

1  including defendant Hitachi-LG Data Storage, Inc. During the Class period, Hitachi, Ltd.

2  manufactured, sold and/or distributed ODD Products throughout the United States.

3  　　　　19.　Defendant Hitachi-LG Data Storage, Inc. is a business entity organized under the

4  laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23

5  Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022. Hitachi-LG Data Storage, Inc. is a joint

6  venture formed in January 2001 and is owned 51% by defendant Hitachi and 49% by defendant

7  LG. During the Class period, Hitachi-LG Data Storage, Inc. manufactured, sold and/or

8  distributed ODD Products throughout the United States.

9  　　　　20.　Defendant LG Electronics, Inc. ("LG") is a business entity organized under the

10  laws of Korea, with its principle place of business at 26/F Twin Tower South 20, Yeouido-Dong,

11  Yeoungdeungpo-Gu, Seoul, SEO 150-721, South Korea. LG controls an integrated global

12  enterprise comprised of itself and other entities including defendant Hitachi-LG Data Storage,

13  Inc. During the Class period, LG manufactured, sold and/or distributed ODD Products

14  throughout the United States.

15  　　　　21.　Defendant Samsung Electronics Co. Ltd. ("Samsung") is a business entity

16  organized under the laws of South Korea, with its principal place of business at Samsung Main

17  Building 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. Samsung controls an

18  integrated global enterprise comprised of itself and other entities including defendant Toshiba

19  Samsung Storage Technology Corp. During the Class period, Samsung manufactured, sold

20  and/or distributed ODD Products throughout the United States.

21  　　　　22.　Defendant Toshiba Corporation ("Toshiba") is a business entity organized under

22  the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chrome, Minato-ku,

23  Tokyo 105-8001, Japan. Toshiba Corp. controls an integrated global enterprise comprised of

24  itself and other entities including defendant Toshiba Samsung Storage Technology Corp. During

25  the Class period, Toshiba manufactured, sold and/or distributed ODD Products throughout the

26  United States.

27  　　　　23.　Defendant Toshiba Samsung Storage Technology Corp. is a business entity

28  organized under the laws of Japan with its principal place of business located at Solid Square

1   580, Horikawacho, Saiwai-Ku, Kawaski, KNG 212-0013, Japan. Toshiba Samsung Storage

2   Technology Corp. is a joint venture formed in 2004 and owned 51% by defendant Toshiba and

3   49% by defendant Samsung.  During the Class period, Toshiba Samsung Storage Technology

4   Corp. manufactured, sold and/or distributed ODD Products throughout the United States.

5        24.     On information and belief, other partnerships, corporations, or other business

6   entities, unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restrain of

7   trade.  These other co-conspirators have facilitated, adhered to, participated in, and/or

8   communicated with others regarding the conspiracy.

9        25.     The conduct alleged herein was Defendants' conduct or actions ordered or done

10  by Defendants' officers, agents, employees, or representatives, while engaged in the usual

11  management of Defendants' business.

12       26.     The conduct alleged herein was Defendants' conduct or actions ordered or done

13  by Defendants' officers, agents, employees, or representatives, while engaged in the usual

14  management of Defendants' business.

15  **III.   AGENTS AND CO-CONSPIRATORS**

16       27.     Various others, presently unknown to Plaintiffs, participated as co-conspirators

17  with the defendants in the violations of law alleged in this Complaint and have engaged in

18  conduct and made statements in furtherance thereof.

19       28.     The acts charged in this Complaint have been done by Defendants and their co-

20  conspirators, or were authorized, ordered or done by their respective officers, agents, employees

21  or representatives while actively engaged in the management of each Defendant's business or

22  affairs.

23       29.     Each of the Defendants named herein acted as the agent or joint venturer of or for

24  the other Defendants with respect to the acts, violations and conduct alleged herein.

25       30.     Co-conspirator Koninklijke Philips Electronics N.V. ("Philips") is a business

26  entity organized under the laws of the Netherlands, with it principal place of business at

27  Groenewoudseweg 1, Eindhoven 5621 BA, The Netherlands.  Philips controls an integrated

28  global enterprise comprised of itself and other entities including defendant Philips & Lite-On

1  Digital Solutions Corporation. During the Class period, Philips manufactured, sold and/or

2  distributed ODD Products throughout the United States.

3        31.  Co-conspirator Lite-On IT Corporation ("Lite-On") is a business entity organized

4  under the laws of Taiwan, with its principle place of business at 12-15F, 392, Jui Kuang Road,

5  Taipei City, TAP 11492, Taiwan. Lite-On controls an integrated global enterprise comprised of

6  itself and other entities including defendant Philip & Lite-On Digital Solutions Corporation.

7  During the Class period, Lite-On manufactured, sold and/or distributed ODD Products

8  throughout the United States.

9        32.  Co-conspirator Philip & Lite-On Digital Solutions Corporation is a business entity

10  organized under the laws of Taiwan, and a joint venture between Koninlijke Philips Electronics

11  N.V. and Lite-On IT Corporation established in March 2007, with its principal place of business

12  located 16F, 392, Jui Kuang Road, Taipei City, TAP 11492, Taiwan. During the Class period,

13  Philips & Lite-On Digital Solutions Corporation manufactured, sold and/or distributed ODD

14  Productions throughout the United States.

15        33.  Co-conspirator Philips & Lite-On Digital Solutions USA, Inc. is a Delaware

16  corporation with its principal place of business located at 42000 Christy Street, Fremont,

17  California 94538. During the Class period, Philips & Lite-On Digital Solutions USA

18  manufactured, sold and/or distributed ODD Products throughout the United States.

19        34.  Whenever in this complaint reference is made to any act, deed or transaction of

20  any corporation, the allegation means that the corporation engaged in the act, deed or transaction

21  by or through its officers, directors, agents, employees or representatives while they were actively

22  engaged in the management, direction, control or transaction of the corporation's business or

23  affairs.

24        35.  Defendants are also liable for acts done in furtherance of the alleged conspiracy by

25  companies they acquired through merges and acquisitions.

26        36.  Each of the Defendants named herein acted as the agent of, co-conspirator with, or

27  joint venturer of the other Defendants with respect to the acts, violations and common course of

28

1 | conduct alleged herein. Each Defendant that is subsidiary of a foreign parent acts as the United

2 | States agent for ODDs and/or ODD Products made by its parent company.

3 | IV.     CLASSES AND REPRESENTATIVE ALLEGATIONS

4 |      37.     Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil

5 | Procedure 23(a) and (b)(2) and (3), on behalf the following Classes:

**Nationwide class for injunctive relief under Rule 23(b)(2) on behalf of all Plaintiffs**
All person and entities residing in Arizona that, from at least November 1, 2005, through the present that indirectly purchased ODD Products from one or more Defendants for their own use and not for resale.

**Arizona class for money damages under Rule 23(b)(3) on behalf of Scott Friedson**
All person and entities residing in Arizona that, from at least November 1, 2005, through the present that indirectly purchased ODD Products from one or more Defendants for their own use and not for resale.

**Kansas class for money damages under Rule 23(b)(3) on behalf of Guy Snowdy**
All person and entities residing in Kansas that, from at least November 1, 2005, through the present that indirectly purchased ODD Products from one or more Defendants for their own use and not for resale.

**Minnesota class for money damages under Rule 23(b)(3) on behalf of Sharon Defren**
All person and entities residing in Minnesota that, from at least November 1, 2005, through the present that indirectly purchased ODD Products from one or more Defendants for their own use and not for resale.

Excluded from these classes are Defendants; the officers, directors or employees of any Defendants; any entity in which any Defendant has a controlling interest; and any affiliate legal representative, heir or assign of any Defendant.

      38.     Plaintiffs purchased ODD Products during the class period and are therefore members of their respective classes, as well as the Nationwide class.

      39.     The total number of Classes members in each classes is so large that individual joinder of all members of the respective Classes is impracticable.

      40.     Plaintiffs' claims are typical of the claims of the members of the Classes, since Plaintiffs and all members of the Classes purchased ODD Products during the class period alleged herein, their claims arise from the same course of conduct, and the relief sought is common.

41.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes as their interests are typical of the rest of the Classes and they have no conflict with other Classes Members.  Plaintiffs have retained experienced and competent counsel.

42.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)     Whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain, or stabilize the price of ODD Products sold in the United States, and in particular Arizona, Kansas, and Minnesota;

(b)     Whether the conduct of Defendants caused the prices of ODD Products to be artificially inflated in Arizona, Kansas, and Minnesota;

(c)     Whether Defendants engaged in a contract, combination, and/or conspiracy to restrict output of ODD Products sold in the United States, and in particular Arizona, Kansas, and Minnesota;

(d)     Whether Defendants' conduct caused injury to the members of the Classes and, if so, the proper measure of damages;

(e)     Whether Plaintiffs unjustly enriched Defendants;

(f)     Whether plaintiffs and the other members of the Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

(g)     Whether Defendants undertook actions to conceal the unlawful contract, combination or conspiracy described herein.

43.     Joinder of all members of the classes is not possible, the claims of individual Classes members are too small to justify an individual action, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

44.     Class certification is appropriate under Federal Rule 23(b)(2) because Defendants acted on grounds generally applicable to Plaintiffs and the Nationwide class members all of whom are at imminent risk of irreparable harm by continuing to pay supra-competitive prices for ODD Products.

## V.    TRADE AND COMMERCE; NATURE OF THE OPTICAL DISC DRIVE MARKET

45.     Sony Optiarc Inc., had sales of $1.52 billion for the year ended March 2008, the last year for which Sony disclosed the unit's annual revenue.

46.     Hitachi-LG Data Storage had revenue of $2.4 billion in 2005, the last year for which figures are available, while Toshiba Samsung Storage forecast revenue of 250 billion yen in fiscal 2004 when it was established.

47.     Samsung in 2008 estimated that the ODD market for personal computers is 313 million units per year and the ODD market for all other applications (e.g., automotive audio and video, personal video recorders, set to boxes, CD/DVD players and recorders, camcorders, and game consoles) is 200 million units per year.

48.     During the Class period, each Defendant, or one or more of its subsidiaries, sold ODD Products in the United States and in this Northern District in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

49.     During the Class period, Defendants collectively controlled a majority of the market for ODD Products, globally, in the United States, in Arizona, Kansas, and Minnesota, and within this district.

50.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States, and in particular in Arizona, Kansas, and Minnesota.

# VI.   FACTUAL ALLEGATIONS

## A.   Optical Disk Drive Technology

51.     An ODD is a disk drive that uses laser light or electromagnetic waves near the light spectrum as part of the process of reading or writing data to or from optical discs.

52.     Some drives can only read from discs, but recent drives are commonly both readers and recorders.

53.     Recorders are sometimes called burners or writers.  Compact discs, DVDs, High-Definition ("HD")-DVDs and Blu-ray discs are common types of optical media which can be bread and recorded by ODDs.

54.     ODDs are an integral part of stand-alone consumer appliances such as CD players, CD-ROMs, DVD players and DVD recorders.

55.     ODDs are also very commonly used in computers to read software and consumer media distributed in disc form, and to record discs for archival and data exchange.

56.     Optical drives have mostly displaced floppy disk and magnetic tape drives for this purpose because of the low cost of optical media and the near-ubiquity of optical drives in computers and consumer entertainment hardware.

57.     For DVD base speed, or "1x speed", is 1.385 MB/s, equal to 1.32 MiB/s, approximately 9 times faster than CD's base speed.  For Blu-ray drive base speed is 6.74 MB/s, equal to 6.43 MiB/s.

58.     The first-generation of ODDs used CDs that could store 650 megabytes of data, but for several years the CDs were available only in a read-only format (e.g. CD-ROMs).  Once the standard of how to create a CD and an optical device that reads the information on the CD were established, CD-ROM drives began to penetrate the computer market.

59.     ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer.

60.     In the mid-1990s, a consortium of manufactures developed the second generation

---

Case No. _____ – CLASS ACTION COMPLAINT                                          11

of the optical disk, the DVD.  The second-generation of drives used DVDs that could store 4.7 gigabytes, but DVDs were more quickly available in both a read only format (e.g. DVD-ROMs) and a format that allowed both reading and recording (e.g. DVD-RWs, DVD-RAMs).

61.     The DVD was intended to store great amounts of data, including broadcast quality video.

62.     ODDs using DVDs are currently the most prevalent in both consumer electronics products and computers, but DVD drives are now being replaced by the third-generation of ODDs.

63.     The third-generation of ODDs use Blu-Ray Discs that can store in excess of 20 gigabytes, and also have read-only and read/record formats.

64.     The Blu-Ray and High-Definition ("HD")-DVD began development in 2000.  The Blu-ray standard was developed by the Blu-Ray Disc Association, an industry group which included makers of consumer electronics, computer hardware, and motion pictures.

65.     The Blu-Ray optical disc was meant to be able to distribute HD video and support greater data storage capacity than the second-generation optical disc, the DVD.

66.     In 2006, the specifications for the Blu-Ray Disc format were finalized.

67.     Afterwards, manufactures began to develop ODDs for computers that could read and write both DVDs and Blu-Ray discs.

68.     Toshiba developed and promoted a HD-DVD format for the third-generation ODDs, but in June 2008 Toshiba announced that it would no longer develop or manufacture ODDs using HD-DVDs, and would instead use the Blu-Ray Disc format developed and promoted by Sony.

69.     Table 1 provides an overview of the names, sizes and capabilities of the main, available ODD standards.  There are also differences in ODDs with regard to data access speeds and writing speeds.  ODDs built more recently are "backwards compatible" such that ODDs with the latest technology can still read first generation CD-ROMs.  DVD rewritable drives have been the mainstream ODD used in computers since 2006.

| Table 1: Overview of Optical Disc Drive Standards | | |
|---|---|---|
| DRIVE STANDARD | CAPACITY [a] | CAPABILITY |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R [b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RE | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |
| [a] These are standard capacities.  Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger. | | |
| [b] There are other DVD standards such as DVD+R/RW, which includes other features or improvements-see http://www.videohelp.com/dvid. | | |
| Source: See http://www.videohelp.com/dvd and http://www.tech-faq.com/blu-ray.shtml. | | |

70.     Throughout the industry's history, the ODD market has been dominated by a small group of manufactures.

71.     The industry has also consistently been faced with downward pricing pressures, including those resulting form the technological advances in ODD technology.

72.     Defendants have increased their ability to manufacture these ODD Products more efficiently and at a lower cost.

73.     The defendants, sensing that the price of ODD Products was declining, decided to collude and enter into a price fixing agreement in order to prevent prices from dropping too far.

74.     According to an IDC analysis, between 2004 and 2008, worldwide ODD shipments generated over $45 billion in revenues.

75.     Digitimes research estimates that worldwide ODD shipments increased at an annual rate of approximately 10%, exceeding 300 million by 2007.

76.     Between 2004 and 2008, the sale of ODD Products generated over $45 billion in revenues.

77.     According to Gartner, by 2013, the ODD market will grow to $3.9 billion.

78.     Since the ODDs market is dominated by a group of manufactures and it is oligopolistic in nature, the market is conducive to the collusive conduct alleged herein.

79.     Defendant Sony's President and Electronics CEO, Ryobi Chubachi, stated after the signing of a Memorandum of Understanding between Sony and NEC in 2005 that "Optical disc drives are key components for a broad range of devices and we are strategically focused our development resources in this sector. By teaming with NEC which has excellent technology in areas such as DVD drives, I believe we can work effectively to enhance our product lineup and quality on a global scale."

80.     NEC's President Akinobu Kanasugi stated that, "The market for high value-added drives to be integrated into PCs and consumer electronics products is rapidly expanding. This will allow us to realize the aim of becoming the top vendor in this sector."

81.     As the ODDs Products market has changed, the Defendants have consistently remained leaders in the industry as a result of their conspiratorial acts.

82.     While the market for CD-ROMs has decreased, the market for Blu-Ray discs has grown exponentially as consumers shift towards the new format.

83.     In a 2008 consumer survey, 56% of customer respondents would consider purchasing a Blue-Ray disc player if there was a significant price drop.

84.     The Defendants, acting in a non-conspiratorial manner, would have slashed their prices in an effort to obtain as large a share of the market as possible. By entering into a price-fixing agreement, each of the Defendants would be able to hold steady on their market share without any significant price reductions.

**B.      Opportunity for Collusion and Serial Offenses of the Antitrust Laws**

85.     There are a number of factors that occurred in the ODD industry during the Class period, which have contributed to the opportunity for defendants and their co-conspirators to

1   implement their conspiracy, including but not limited to the following described below in more

2   detail.

### 1.   Joint Ventures & Market Concentration

4        86.     Since the ODD Products market is dominated by a group of manufacturers and it

5   is oligopolistic in nature, the market is conductive to the collusive conduct alleged herein.

6        87.     According to published reports, during the Class period, the ODD Products

7   industry has been dominated by Defendants and their Co-Conspirators.

8        88.     During the Class period the joint venture between Hitachi and LG Electronics,

9   Hitachi-LG Data Storage, had a 27% market share.

10       89.     During the Class period, the joint venture between defendants Toshiba and

11  Samsung, defendant Toshiba Samsung Storage Technology had a 20% market share.

12       90.     During the Class period, defendant Sony Optiarc America had a 17% market

13  share.

14       91.     During the Class period, Co-Conspirators Philips & Lite-On Digital Solutions

15  Corporation had a 30% market share.

16       92.     Together these defendants and Co-Conspirators control over 90% of the global

17  market for ODD Products.

### 2.   Joint Venture Collaboration

19       93.     In October of 2000 Hitachi, Ltd., and LG Electronics Inc. jointed together to form

20  Hitachi-LG Data Storage, Inc. ("HLDS"), a joint venture which was established for the purposes

21  of designing and marketing ODDs.

22       94.     HLDS is majority owned by Hitachi in a 51/49 percent equity split.

23       95.     In April of 2003 Samsung Electronics and Toshiba Corporation signed a

24  Memorandum of Understanding.

25       96.     The new joint venture, Toshiba Samsung Storage Technology Corp. brought

26  together the procurement and sales for ODDs, including CD-ROM and DVD-ROM drives and is

27  51 percent owned by Toshiba and 49 percent owned by Samsung Electronics.

28

97.    In April of 2006, Sony Corporation and NEC Corporation joined forces to create Sony NEC Optiarc, Inc.

98.    At the formation of the joint venture, Sony had a 55% equity share and NEC 45% and was projected to capture 20% of the ODD market.

99.    On September 11, 2008, Sony purchased NEC Corp.'s interest in Sony NEC Optiarc, Inc., and renamed it Sony Optiarc, Inc.

100.    In 2006, Lite-On IT acquired BenQ's ODD business to become the second largest ODD manufacture in the world.

101.    Lite-On bought out the BenQ shares under the deal and the joint venture was renamed Philips & Lite-On Digital Solutions.

102.    The joint ventures of each of these companies allowed them to share and have access to each of their parent companies patents and technologies without the need to pay royalties.

### 3.    Barriers to Entry Into the ODD Industry

103.    There are significant manufacturing and technological barriers to entry into the ODD industry.

104.    In order to compete in the ODD industry, companies have to spend hundreds of millions of dollars in research and development, licensing, and manufacturing of products.

105.    The ownership and control exerted by defendants over ODD Product technology and market share has allowed defendants to dictate who enters the market and at what cost.

106.    These barriers to entry have made it extremely difficult for smaller manufactures of ODD Products to compete with defendants and overcome the effects of economies of scale.

107.    The financial structure of the ODD industry allowed defendants to implement their antitrust conspiracy by eliminating competition and artificially stabilizing the prices of ODD Products without losing market share.

108.    Price-fixing and market allocation are easier to attain within a highly concentrated, fungible market for which adequate substitutes do not exist.

109. All of these factors facilitate the implementation and maintenance of an antitrust conspiracy such as that perpetrated by Defendants and alleged herein.

### 4. Trade Associations and Business Organizations

110. Defendants acted to prevent downward pricing pressures from causing ODD Products to be sold at truly competitive prices, through means including price-fixing, bid-rigging and market allocation.

111. Various industry trade organizations or events facilitated Defendants' ODD Products carte activities.

112. Defendants participated in many of those meetings and events to discuss ODD Products pricing and production with the purpose and effect of raising, fixing and stabilizing ODD Product prices.

113. Such meetings occurred at or through the following trade association events:

114. The Optical Storage Technology Association (OSTA.org), an international trade association formed in 1992 to promote the use of recordable optical technologies and products for storage of computer data.

115. The membership includes optical product manufactures who represent more than 85 percent of worldwide writable optical product shipments, including LG and Sony.

116. The last meeting of the OSTA took place between March 16-18, 2009 at the Pacific Business Centers at 19925 Stevens Creek Blvd, Cupertino, CA 95014.

117. At that meeting, in which the Defendants were present, they were able to meet and communicate regarding the price-fixing conspiracy.

118. The DVD Forum, a global group of hardware manufactures, software firms and content providers formed in 1997 to promote and improve standards for the DVD format and products associated with that format.

119. Hitachi, LG, Lite-On, NEC, Philips, Samsung, Sony, and Toshiba are all members of the DVD Forum.

120. The Steering Committee of the DVD Forum last met on September 10, 2009 at the Universal Hilton Hotel in Los Angeles, California.

121.   Defendant Toshiba was the chair of that Steering Committee meeting. At that meeting, the members of the conspiracy and other co-conspirators were able to communicate with each other about the conspiracy and agreed to continue to fix the price ODD Products sold across the world, including in the United States.

122.   The Blu-ray Disc Association ("BDA"), a worldwide group inaugurated in 2004 to promote the Blu-ray Disc format and products associated with that format, with members including Hitachi, LG, NEC, Philips, Samsung, Sony, and Toshiba.

123.   Defendant Sony, LG, and Hitachi are all founding board members of the BDA which is an industry consortium that develops and licenses Blu-ray Disc Technology.

124.   The Blu-ray Disc Association was established by the defendants to establish standardized format and cross license technology.

125.   Defendants Sony, LG, Hitachi, and Samsung all participated in the first meeting of Blu-ray Disk patent owners in Lost Angles, California on July 6-7, 2006.

126.   The stated purpose of the event was to crate joint licensing agreements amongst the participating ODD manufactures.

127.   The International Consumer Electronics Show, the world's largest consumer electronics show, held annually.

128.   The 2010 International Consumer Electronic Show took place from January 7-10, 2010 at the Venetian in Las Vegas, Nevada.

129.   One of the topics of conversation at the show was the DOJ investigation into the ODD Products.

130.   Members of the conspiracy communicated with each other about the conspiracy during the 2010 International Consumer Electronics Show.

131.   The Optical Storage Symposium (OSS), a worldwide conference held annually form 2001-07.

132.   The conduct of the "business" of these organizations gave Defendants and their co-conspirators the cover needed to contact one another to communicate competitive information.

Case No. _____ -- CLASS ACTION COMPLAINT                                    18

**5.      Standardization of Optical Disk Drive Products**

133.    Since its inception in the 1970s, the ODD industry has been typified by standardization of discs (e.g., CD-ROMs, DVD-ROMs) and ODD Products driven by industry participants and a variety of industry-related organizations such as EMCA International, the International Standardization Organization ("ISO"), and the International Electrotechnical Commission ("IEC").

134.    These organizations and their members are dedicated to "standardizing the use of information communication technology and consumer electronics."

135.    The ODD industry is also subject to patents and intellectual property rights which require adoption of standardized product specifications.

136.    The standardization of the ODD Products industry provided defendants with the mechanism to implement, enforce, and oversee their anticompetitive conspiracy to fix the price of ODD Products.

137.    Furthermore, as a result of this standardization, ODD Products are commodity products, and buyers make decisions to purchase such products based larges if not exclusively, on price.

**C.      History of Collusion**

**1.      Previous Antitrust Violations**

138.    Many of the Defendants named herein have a long history of collusion.

139.    Many of the Defendants have been the subject of worldwide governmental investigation for their cartel activity in recent years and specifically, in the consumer technology area.

140.    Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufactures of dynamic random access memory ("DRAM") computer chips.

141.    In December of 2008, the Department of Justice ("DOJ") announced that LP Display, a joint venture between LG and Philips, would plead guilty to a DOJ indictment alleging antitrust price-fixing allegations with respect to TFT-LCDs.

142.   The LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD flat panel televisions.

143.   The LG Defendants in the TFT-LCD criminal matter pled guilty and agreed to pay a $400 million fine.

144.   On March 10, 2009, the DOJ announced that Hitachi Displays had pled guilty to participation in the price-fixing conspiracy involving TFT-LCDs and had agreed to pay a $31 million fine.

145.   In this Northern District, there has been litigation over whether defendant Samsung Electronics Co., Ltd. is the Amnesty Applicant in the U.S. DOJ leniency program with respect to the DOJ's investigation into the market for TFT-LCD. If this is true, as widely believed by the industry and observers, Samsung has admitted its participation in a worldwide cartel involving sales in the billions. Samsung has not admitted that it is the amnesty applicant in the TFT-LCD investigation, but has not denied it either.

146.   The DOJ's TFT-LCD investigation is ongoing. Toshiba Corporation, as well as other entities, remains under investigation. This criminal investigation is being led by the San Francisco office of the DOJ's Antitrust Division.

147.   Other enforcement agencies including in the EU, Japan, Korea and Australia are believed to be maintaining open investigations into price fixing and anticompetitive activities with regard to the TFT-LCD industry and many of the named Defendants herein.

148.   As in the TFT-LCD industry, many of the defendants here are not just the major manufactures and sellers of the price-fixed product, they are also the major manufactures and sellers of the consumer electronics and computer products that contain the price-fixed product.

149.   In November of 2007, the EU fined Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

150.   Hitachi and Toshiba were fined by the European Commission for their roles in a conspiracy to control prices and allocate market shares in the market for gas-insulated switchgear, between 1998-2004.

151.    More recently, the DOJ and the European Commission ("EC") have commenced investigations of Samsung, Toshiba, LG and Hitachi, among others, concerning collusion among manufacturers of thin-film transistor liquid crystal displays ("TFT-LCDs").

152.    LG and Samsung (and Hitachi, Toshiba, Philips, Lite-On and Sony) manufacture and sell both ODDs (e.g. DVD drives) and finished products containing those drives (e.g. DVD players, laptop computers).

153.    On October 7, 2009 in a cease and desist order, the Japan Fair Trade Commission levied $37.4 million in fines against five companies, including LG Philips Displays Korea Co. and an arm of South Korea's Samsung group and their affiliates for alleged participation in a price-fixing cartel for cathode ray tubes.

154.    The ODD industry has a similar oligopoly structure to that of the TFT-LCD, DRAM and ODD industries.

155.    The Defendants' entry into price-fixing agreements in those markets (which include many of the same foreign players) supports the DOJ's investigation and other evidence showing the existence of an anticompetitive conspiracy in the ODD Products market.

156.    The established illegal conduct of Hitachi, LG and Samsung (as well as Philips and Sony) in a wide variety of product markets across the world, including the United States, is illustrative of Defendants' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

157.    For example, in November of 2007, Kim Yong Chul, the former chief lawyer for Samsung, admitted that the company "instructed me to commit crimes." Chul continued, "[a] basic responsibility for all Samsung executives is to do illegal lobbying, buying people with money." Chul also acknowledged that the fabricated court evidence on behalf of the company and its executives, and several Samsung executives have recently been convicted of bribery and other white collar crimes.

### 2.    Antitrust Violations Concerning Optical Disk Drive Products

158.    Recently, defendants disclosed and news organizations reported that there is currently a worldwide investigation by antitrust enforcement authorities into violations of antitrust laws and other anticompetitive practices into the market for ODDs.

159.    In October of 2009, the Untied States DOJ acknowledged that it had commenced an investigation into anticompetitive conduct in the ODD industry, and that in connection with that investigation it had served subpoenas on defendants Sony Optiarc America, Hitachi-LG, and TSST.    At the same time, at least one defendant acknowledged that foreign antitrust enforcement agencies were also investigation the ODD industry.

160.    For example, on October 23, 2009, Sony Corporation disclosed the following in a Form 6-K it filed with the SEC:

> Sony Corporation said today that it U.S. subsidiary, Sony Optiarc America In., has received a subpoena from the U.S. Department of Justice (DOJ) Antitrust Division seeking information about its optical disk drive business.  Sony understands that the DOJ and agencies outside the Untied States are investigation competition in optical disk drives.

161.    On October 26, 2009, news sources reported that other companies, including Toshiba, Hitachi, Samsung and LG have received DOJ subpoenas.

162.    According to one of the news articles, and unnamed "source said that the department began the probe in recent months, investigation disk-drive makers for possible price-fixing, bid-rigging and allocation of markets."

163.    Sony has acknowledged that it believes the request from information from the U.S. Department of Justice is part of a wider review of competition in the disk drive market by the DOJ and competition authorities in other countries.

164.    On October 27, 2009, Hitachi Ltd. and Toshiba Corporation confirmed that, like Sony Corporation, their ODD operations in the United States received subpoenas from the U.S. Department of Justice in a widening investigation into potential antitrust violations.

165.    Additionally, they acknowledged that they were also under investigation by European Union and Singaporean antitrust regulators.

1    166.    On October 27, 2009, a Untied States DOJ spokeswoman, Gina Talamona

2    confirmed that, "the U.S. Justice is looking into possible violations of antitrust law within the

3    optical disc drive industry."

4    167.    On October 28, 2009, it was announced that two of the major players in the ODD

5    Products market, Sony and Philips, were fined by the foreign antitrust enforcement agency, the

6    Taiwan Fair Trade Commission ("TFTC"), for their anticompetitive business practices in

7    connection with their abuse of monopoly power in the licensing of the technology for CD-Rs, the

8    disc that go into ODDs.

9    168.    Dr. Len-yu Liu, Commissioner of the TFTC issued a report that stated Philips and

10   Sony's joint licensing practices were in violation of the provision of the Fair Trade law regarding

11   concerted actions, as well as price setting by monopolistic enterprises.

12   169.    The final disposition of the TFTC found that the joint licensing agreement among

13   Sony and Philips enabled them to obtain an unfair and overwhelming position in the CD-R patent

14   licensing market. Given these violations the TFTC imposed administrative fines of 251,928 USD

15   on Philips, 125,964 USD on Sony, and ordered the companies to immediately cease the illegal

16   practices.

17   170.    Pricing trends for the ODD technology have not followed the traditional price

18   declination expected from an older technology. In fact, despite the HD-DVD vanishing from the

19   market, prices form Blu-Ray ODDs have remained substantially the same over time.

20   171.    It is significant that defendants' anticompetitive behavior has been the subject of a

21   criminal grand jury investigation by the DOJ.

22   172.    In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust

23   Division attorney must believe that a crime has been committed and prepare a detailed

24   memorandum to that effect. See Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a

25   Division attorney believes that criminal violation of the antitrust laws has occurred, he should

26   prepare a memorandum requesting authority to conduct a grand jury investigation.")

27

28

173.    Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred. *See id.*

174.    In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.

175.    The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid-rigging and horizontal customer and territorial allocations." *See* Antitrust Division Manual, Chapter III.C.5.

176.    Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

**D.    Effects of Defendants' Antitrust Violations**

177.    The above combination and conspiracy has had the following effects in Arizona, Kansas, and Minnesota, including but not limited to:

    a)    Prices charged to plaintiffs and the Classes for ODD Products have been raised, fixed, maintained or stabilized at artificially inflated, non-competitive levels.

    b)    Plaintiffs and the Classes have been deprived of the benefits of free, open and unrestricted competition in the market for ODD Products.

    c)    Competition in establishing the prices paid in the United States and worldwide for ODD Products has been unlawfully restrained, suppressed and eliminated.

    d)    Inflated prices have been passed on from direct purchasers to indirect purchasers; and

    e)    Indirect purchasers of ODD Products have been deprived of the benefit of free and open competition in the purchase of ODD Products.

178. By reason of the violations as described herein, Plaintiffs and the members of the Classes have sustained injury in their business and property in that they have paid more for ODD Products than they otherwise would have in the absence of Defendants' unlawful conduct.

## VII. FRAUDULENT CONCEALMENT

179. Plaintiffs and members of the Classes did not discover and could not discovery through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until October 26, 2009 when it was first publicly reported that manufactures of ODDs were under investigation by antitrust authorities in the United States, and elsewhere in the world, for anticompetitive conduct.

180. Because Defendants' agreements, understandings, and conspiracies were kept secret until October 26, 2009, Plaintiffs and the members of the Classes before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying artificially high prices for ODD Products throughout the United States, and in particular in Arizona, Kansas, and Minnesota, during the Class period.

181. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

182. By their very nature, Defendants' price fixing conspiracy was inherently self-concealing. The ODDs industry is not exempt from antitrust regulation, and thus, before October 26, 2009, Plaintiffs reasonably considered it to be a well-regulated competitive industry.

183. Defendants repeatedly gave pre-textual justifications for the inflated prices of ODDs and ODD products in furtherance of the conspiracy.

184. Defendants consummated affirmative acts of concealment of the conspiracy, including, inter alia, periodically issuing press statements falsely asserting that ODD Products were competitively priced. For example, on June 4, 2007 Sony issued a press release stating, "The player (Sony's Blu-Ray Disc Player) gives a broader consumer segment the opportunity to experience the exceptional quality of Blu-Ray format at competitive price."

185. Plaintiffs and members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

186. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until October 26, 2009, when reports of the investigations into price fixing in the ODDs industry were first publicly disseminated.

187. As result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and members of the Classes have as a result of the anticompetitive conduct alleged in this Complaint.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act**
**(Applicable to the Nationwide Class on behalf of all Plaintiffs)**

188. Plaintiffs hereby incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189. Beginning at least as early as November 1, 2005, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants, their agents and co-conspirators engaged in a continuing contract, combination or conspiracy to suppress and eliminate competition by fixing the prices of ODDs. The contact, combination or conspiracy engaged in by Defendants and their co-conspirators was an unreasonable restrain of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.SC. § 1).

190. In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize prices of ODD Products sold in the United States.

191.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concert action among Defendants, their agents and/or their co-conspirators, the substantial terms of which were to agree to fix the prices of ODDs.

192.   As a result of Defendants' unlawful conduct, prices for ODD Products were raised, fixed, maintained, and stabilized in the United States.

193.   For the purposes of formulating an effectuating the charged contract, combination, or conspiracy, Defendants, their agents and co-conspirators did those things they contracted, combined, or conspired to do, including, among other things:

a.   Participating in meetings, conversation and communications to discuss the prices  and supply of ODD Products;

b.   Communicating in writing and orally to fix prices of ODD Products;

c.   Agreeing, during those meetings, conversations and communications, to manipulate and set pre-determined prices and supply of ODD Products sold in the United States in a manner that deprived indirect purchasers of free and open competition in the market;

d.   Issuing price announcements and price quotations in accordance with agreements reached;

e.   Selling ODD Products to direct purchasers in the United States at non-competitive prices, which were then passed on to indirect purchasers;

f.   Providing false statements to the public to explain increased prices for ODD Products; and

g.   Exchanging information on sales of ODD Products, for purposes of monitoring and enforcing adherence to the agreed-upon prices.

194.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of a Nationwide Class have been injured in their businesses and property in that they have paid more for ODD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

195.     Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF

#### Violation of the Arizona Antitrust Act
#### (Applicable to the Arizona Class on behalf of Friedson)

196.     Friedson hereby incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

197.     During the Class Period, Defendants engaged in a flagrant contract, combination, or conspiracy in restraint of trade or commerce within Arizona. In particular, Defendants conspired to fix ODD Products prices and allocate ODD Products customers and markets. Defendants' conspiracy lessened full and free competition in ODD Products importation and sale into Arizona and controlled its costs, which violated Ariz. Rev. Stat. §44-1401 *et seq.*

198.     Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize ODD Products' prices; (b) allocate ODD Products' customers and markets; and (c) caused Friedson and the other Arizona class members to pay higher prices for ODD Products that they indirectly purchased from Defendants.

199.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

        a.     Met to discuss ODD Products' customers and markets;

        b.     Agreed to charge prices at certain levels and to increase or maintain prices for ODD Products sold in Arizona;

        c.     Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

        d.     Allocated ODD Products' markets and customers consistent with their illegal agreement.

200. Defendants' conspiracy had the following effects:

    a.    ODD Products' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Arizona;

    b.    ODD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Arizona;

    c.    Friedson and the other Arizona class members that indirectly purchased ODD Products were deprived of free and open market competition and were injured; and

    d.    Friedson and the other Arizona class members paid more than they otherwise would have for ODD Products that they purchased indirectly.

201. Defendants' conspiracy substantially affected trade or commerce within Arizona.

202. As a direct and proximate result of Defendants' unlawful conduct, Friedson and the other Arizona class members were injured by having paid more products containing ODD Products than they otherwise would have absent Defendants' conspiracy.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment Under Arizona Law
### (Applicable to the Arizona Class on behalf of Friedson)

203. Friedson hereby incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

204. As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Friedson and the Arizona class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its

1    reasonable value to Friedson and the class members.

2         205.   As a direct and proximate result of Defendants' unjust enrichment, Friedson

3    and the Arizona class members suffered injury and seek an order directing Defendants to

4    return to them the amount each of them improperly paid to Defendants, plus interest.

5

6                            **FOURTH CLAIM FOR RELIEF**

7                          **Violation of the Kansas Antitrust Act**
                  **(Applicable to the Kansas Class on behalf of Snowdy)**
8
9         206.   Snowdy hereby incorporates and realleges, as though fully set forth herein, each

10   and every allegation set forth in the preceding paragraphs of this Complaint.

11        207.   During the Class Period, Defendants were parties to an agreement, contract,

12   combination, and conspiracy to fix, raise, stabilize, and maintain ODD Products' prices and

13   allocate ODD Products customers and markets.  Defendants' agreement, contract,

14   combination, and conspiracy lessened full and free competition in the importation and sale of

15   ODD Products imported into Kansas and controlled the cost of ODD Products to consumers.

16

17        208.   Defendants' agreement, contract, combination, and conspiracy included their

18   concerted actions and undertakings with the purpose and effect to: (a) fix, raise, maintain, and

19   stabilize ODD Products' prices; (b) allocate ODD Products' customers and markets; and (c)

20   cause Snowdy and the Kansas Class members to pay higher, supracompetitive ODD Products'

21   prices.

22

23        209.   In formulating and effectuating their illegal agreement, contract, combination,

24   and conspiracy, Defendants and their co-conspirators:

25              a.    Met to discuss ODD Products prices, customers, and markets;

26              b.    Agreed to charge prices at certain levels and to increase or

27                    maintain prices for ODD Products sold in the U.S., including in

28                    Kansas;

1           c.     Issued price announcements, quotations, and charged prices

2                consistent with their illegal agreements; and

3           d.     Allocated ODD Products' markets and customers consistent

4                with their illegal agreements.

5      210.    Defendants' illegal agreement, contract, combination, and conspiracy

6  had the following effects:

7           a.     ODD Products price competition was restrained, suppressed,

8      and         eliminated throughout the U.S., including in Kansas;

9           b.     ODD Products prices were raised, fixed, maintained, and

10                stabilized at artificially high, supracompetitive levels

11                throughout the U.S., including in Kansas; and

12           c.     ODD Products purchasers were deprived free and open market

13                competition and were injured.

14

15      211.    Defendants' illegal agreement, contract, combination, and conspiracy

16  substantially affected commerce within Kansas.

17      212.    As a direct and proximate result of Defendants' unlawful conduct,

18  Snowdy and the Kansas class members were injured by having paid more for ODD

19  Products than they otherwise would have paid absent Defendants' unlawful conduct.

20

21                    **FIFTH CLAIM FOR RELIEF**

22                 **Unjust Enrichment Under Kansas Law**

23            ***(Applicable to the Kansas Class on behalf of Snowdy)***

24

25      213.    Snowdy hereby incorporates and realleges, as though fully set forth herein, each

26  and every allegation set forth in the preceding paragraphs of this Complaint.

27      214.    As the result of Defendants' illegal agreement, contract, combination,

28  and conspiracy, Snowdy and the Kansas class members conferred a benefit upon

1   Defendants, and Defendants received and retained this benefit under such

2   circumstances that it would be inequitable and unconscionable to permit Defendants to

3   retain this benefit without paying its reasonable value to Plaintiff and the class

4   members.

5

6       215.    As a direct and proximate result of Defendants' unjust enrichment,

7   Snowdy and the Kansas class members suffered injury and seek an order directing

8   Defendants to return to them the amount each of them improperly paid to Defendants,

9   plus interest.

10

11                          SIXTH CLAIM FOR RELIEF

12                  Violation of the Minnesota Antitrust Act
            (Applicable to the Minnesota Class on behalf of Defren)
13

14      216.    Defren hereby incorporates and realleges, as though fully set forth herein, each

15   and every allegation set forth in the preceding paragraphs of this Complaint.

16
        217.    During the class period, Defendants engaged in a flagrant contract,
17
    combination, or conspiracy in restraint of trade or commerce within Minnesota.  In particular,
18
    Defendants conspired to fix ODD Products prices and allocate ODD Products customers and
19
    markets.  Defendants' conspiracy lessened full and free competition in ODD Products
20
21   importation and sale into Minnesota and controlled its costs, which violated Minn. Stat.

22   §325D.49 *et seq.*

23      218.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and

24   stabilize ODD Products' prices; (b) allocate ODD Products' customers and markets;

25
    and (c) caused Defren and the other Minnesota class members to pay higher prices for
26
    ODD Products that they indirectly purchased from Defendants.
27

28

219.   In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

    a.   Met to discuss ODD Products' customers and markets;

    b.   Agreed to charge prices at certain levels and to increase or maintain prices for ODD Products sold in Minnesota;

    c.   Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

    d.   Allocated ODD Products' markets and customers consistent with their illegal agreement.

220.   Defendants' conspiracy had the following effects:

    a.   ODD Products' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Minnesota;

    b.   ODD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Minnesota;

    c.   Plaintiff and the other Minnesota class members that indirectly purchased ODD Products were deprived of free and open market competition and were injured; and

    d.   Plaintiff and the other Minnesota class members paid more than they otherwise would have for ODD Products that they purchased indirectly.

221.   Defendants' conspiracy substantially affected trade or commerce within Minnesota.

222.   As a direct and proximate result of Defendants' unlawful conduct, Defren and the other Minnesota class members were injured by having paid more products containing ODD Products than they otherwise would have absent Defendants' conspiracy.

### SEVENTH CLAIM FOR RELIEF

#### Unjust Enrichment Under Minnesota Law
*(Applicable to the Minnesota Class on behalf of Defren)*

223.    Defren hereby incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

224.    As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Defren and the Minnesota class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Defren and the Minnesota class members.

225.    As a direct and proximate result of Defendants' unjust enrichment, Defren and the Minnesota class members suffered injury and seek an order directing Defendants to return to them the amount each of them improperly paid to Defendants, plus interest.

## IX.    PRAYER

WHEREFORE, Plaintiffs request that this Court enter judgment in the class members' favor and against Defendants, as follows:

A.    With respect to Count I, that this action may be maintained as a Nationwide class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure and certification of a Nationwide class for injunctive relief is appropriate;

B.    With respect to Counts II-VII, that this action may be maintained as an Arizona, Kansas, and Minnesota class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and certification of the Arizona, Kansas, and Minnesota classes is appropriate;

C.    With respect to Counts II and VI, that Defendants' conspiracy violated Arizona and Minnesota antitrust law and that compensatory damages, including treble damages, are appropriate;

D.    With respect to Count IV, that Defendants' conspiracy violated Kansas

1    law and that compensatory damages, including treble damages and full consideration,

2    are appropriate;

3          E.     With respect to Counts III, V, and VII, that Defendants were unjustly

4    enriched under Arizona, Kansas, and Minnesota law and that disgorgement on a

5    collective basis to Arizona, Kansas, and Minnesota class members, respectively, is

6    appropriate;

7          F.     With respect to Count I, that this Court permanently enjoin Defendants

8    from conspiring to fix ODD Products' prices and allocating ODD Products' markets

9    or other injunctive relief as this Court deems appropriate;

10         G.     With respect to all Counts, that this Court award Plaintiffs post-

11   judgment interest, their costs, and reasonable attorneys' fees; and

12         H.     With respect to all Counts, that this Court order any other relief as it

13   deems just and proper.

14

15   **X.    JURY DEMAND**

16         Plaintiffs demand trial by jury on all triable issues.

17   Dated:  April 13, 2010

Michael Ram (SBN 104805)
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone:    (415) 433-4949
Facsimile:    (415) 433-7311
Email:        mram@ramolson.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON,
P.C.**
700 W. St. Clair Ave., Suite 204
Cleveland, OH  44113-1998
Telephone:    (216) 622.1851
Facsimile:    (216) 241-8175
E-mail:       karon@gsk-law.com

Isaac L. Diel
**SHARP McQUEEN PA**
6900 College Blvd., Suite 285
Overland Park, KS 66223
Telephone:    (913) 661-9931
Facsimile:    (913) 661-9935
Email:        idiel@sharpmcqueen.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Donna F. Solen
**MASON LLP**
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone:    (202) 429-2290
Facsimile:    (202) 429-2294
dsolen@masonlawdc.com

Krishna B. Narine
**THE LAW OFFICE OF KRISHNA B. NARINE**
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Telephone:    (215) 914-2460
Facsimile:    (215) 914-2462
Email:        knarine@kbnlaw.com

Attorneys for Plaintiffs and the Respective Classes